

POSTED ON WEBSITE

# FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

In re                                           )          Case No. 08-14242-B-13
                                                )
Martha Elva Serda,                              )          DC No. PK-1
                                                )
            Debtor.                             )
_____)

**MEMORANDUM DECISION REGARDING DEBTOR'S MOTION
TO VALUE COLLATERAL OF BANKERS HOME LOANS**

Patrick Kavanagh, Esq., appeared for debtor, Martha Elva Serda.

Cassandra J. Richey, Esq., appeared for Bankers Home Loans.

      Before the court is a motion by the debtor, Martha Elva Serda (the "Debtor") to value the collateral of Bankers Home Loans ("Bankers"). Bankers holds the second priority trust deed (the "Bankers' Lien") against the Debtor's residence located in Wasco, California (the "Residence"). The Debtor contends that the fair market value of the Residence at the commencement of the case was less than the debt secured by the first priority trust deed. If that were true, then the Bankers' Lien would be wholly unsecured and the Debtor could provide for Bankers' claim through her chapter 13 plan as a general unsecured claim pursuant to the authority of *Zimmer v. PSB Lending Corporation (In re Zimmer)*, 313 F.3d 1220-1227 (9th Cir. 2002) and *Lam v. Investors Thrift (In re Lam)*, 211 B.R. 36, 40-41 (9th Cir. BAP 1997). The Debtor and Bankers offered competing appraisals prepared by competent and experienced appraisers. For the reasons set forth

1  below, the Debtor's motion will be denied in so far as it seeks to value the Residence at

2  less than the debt secured by the first priority lien.

3       This memorandum decision contains the court's findings of fact and conclusions

4  of law required by Federal Rule of Civil Procedure 52(a), made applicable to this

5  contested matter by Federal Rule of Bankruptcy Procedure 7052.  The court has

6  jurisdiction over this matter under 28 U.S.C. § 1334, 11 U.S.C. § 506[1] and General

7  Orders 182 and 330 of the U.S. District Court for the Eastern District of California.  This

8  is a core proceeding as defined in 28 U.S.C. §§ 157(b)(2)(A) & (L).

9  **BACKGROUND.**

10       The Residence is encumbered by two mortgage liens.  The first trust deed is held

11  by Elmer F. Karpe, Inc. ("Karpe").  Karpe filed a proof of secured claim two months after

12  commencement of the case in the amount of $139,823.98 (the "Karpe Claim").[2]  The

13  Debtor asked the court to take judicial notice of the Karpe Claim for purposes of

14  establishing the amount of secured debt senior to the Bankers' Lien.  Bankers objected.

15  The court took judicial notice only to establish the fact that there is a senior secured debt

16  against the Residence.  The Karpe Claim is hearsay as to the actual amount of the senior

17  debt.  The Debtor's schedules, filed under penalty of perjury, state that the debt to Karpe

18  was $131,480 at the commencement of the case.  The Debtor testified that this figure was

19  accurate based on a recent statement she had received from Karpe prior to preparing her

20

21      [1]Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy

22  Code, 11 U.S.C. §§ 101-1330, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-
9036, as enacted and promulgated *after* October 17, 2005, the effective date of The Bankruptcy

23  Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, Apr. 20, 2005, 119 Stat.
23.

24

25      [2]The Karpe Claim is based on a promissory note for $130,000 dated January 4, 2006.  It
states that the promissory note was in default with an arrearage of $11,139.68.  The Karpe Claim

26  does not provide an accounting to show the principal balance at the commencement of the

27  bankruptcy case and what payments and other charges are included in the arrearage calculation.
It is not clear to the court that a portion of the arrearage claim (the principal portion of the missed

28  payments) is not also included in the principal balance.

schedules. For purposes of this decision, the court accepts the Debtor's schedules and corroborating testimony as the most reliable evidence to establish the amount of the senior secured debt at $131,480.[3]

The Debtor contends that the Residence had a fair market value of $115,000 on July 18, 2008, the date she filed her bankruptcy petition. In support of this value, she offered an appraisal prepared by James E. Graddy ("Graddy"), an experienced and licensed real estate appraiser who specializes in selling and appraising residential properties. Conversely, Bankers contends that the Residence had a fair market value of $145,000. Bankers offered the appraisal and testimony of Kenneth Ricks ("Ricks"), another licensed and experienced real estate appraiser who specializes in the appraisal of residential properties. The expert testimony and evidence on both sides were excellent. However, the appraisers utilized two distinctly different methodologies to arrive at their respective opinions. The court must decide which of those methods is most persuasive and likely to yield the proper result.

## ISSUES PRESENTED.

The motion is described as a motion to value Bankers' collateral, but that title is a misnomer. Actually, the Debtor is asking this court to rule, based on the value of the Residence, that Bankers' claim may be treated as a general unsecured claim, versus a secured claim, in the Debtor's chapter 13 plan.[4] If the Bankers' Lien is determined to be wholly unsecured, then Bankers is not the "holder of a secured claim" whose rights are subject to the "antimodification" protection of § 1322(b)(2).[5] *In re Zimmer, supra,* 313

---

[3]There was no evidence offered of any other senior debt such as property taxes, assessments, or judgment liens, etc.

[4]Bankers filed a proof of claim in the amount of $20,236.11 based on a promissory note for $21,450 dated October 12, 2006. Bankers' proof of claim does not state an estimated value for the Residence.

[5]Section 1322(b) provides in pertinent part:

3

F.3d at 1227. Unless the Bankers' Lien is wholly unsecured, then the plan must provide for full payment of Bankers' claim as a secured claim.[6] If Bankers' claim is treated as a general unsecured claim, then Bankers will receive nothing on account of its claim through the Debtor's chapter 13 plan and the Debtor will receive a discharge of her debt to Bankers upon completion of the plan.[7] For purposes of granting or denying the motion, this court does not need to determine the actual value of the Residence. It only needs to decide whether or not the value of the Residence is greater than, equal to, or less than $131,480, the amount of the senior secured debt to Karpe.

## ANALYSIS.

The Debtor seeks to value Bankers' interest in the Residence based on § 506(a)(1), which states:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim. *Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.* (emphasis added).

When the debtor intends to stay in her house, the proper valuation of the house under § 506(a) is the fair market value ("FMV"). *Taffi v. United States of America (In re Taffi)*, 96 F.3d, 1190, 1192 (9th Cir. 1996). The FMV is not the "replacement" value

---

> Subject to subsections (a) and (c) of this section, the plan may –
>
> . . .
>
> (2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence . . . .

[6]Bankruptcy Code § 1322(b)(2) prevents the Debtor from bifurcating or "stripping down" the Bankers' claim to a partially secured and partially unsecured claim based on the value of its collateral. *Nobelman v. American Sav. Bank*, 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993).

[7]The Debtor's chapter 13 plan provides for a 0% dividend to the general unsecured creditors.

4

because the house is not being replaced. Neither is it the "foreclosure" value because no foreclosure is intended in the chapter 13 plan. *Id.* The FMV is "the price which a willing seller under no compulsion to sell and a willing buyer under no compulsion to buy would agree upon after the property has been exposed to the market for a reasonable time." *Id.*

The debtor bears the initial burden of proof of overcoming any presumption established by the stated value in the secured creditor's proof of claim. The secured creditor has the ultimate burden of persuasion to demonstrate by a preponderance of the evidence the value of the collateral which secures its claim. *In re Southmark Storage Associates Ltd. Partnership*, 130 B.R. 9, 10 (Bankr. D.Conn. 1991).

Here is no dispute that the residential real estate market has been distressed and that the market value of homes, like the Residence, was generally declining at the time this case was filed. Graddy testified that 30 to 50% of the residential properties currently on the market in Wasco, California, are "bank-owned" properties, *i.e.*, properties that a bank was trying to sell after a foreclosure.

Both expert witnesses used the "direct sales" method to value the Residence, *i.e.*, they used actual sales of comparable properties, or "comps" as the starting point for determining the value of the Residence. Both appraisers adjusted the value of their comps from the date of sale to the date of commencement of the bankruptcy case to reflect the rate of decline in the real estate market. Graddy looked at five comps and converted the value of each comp to a price per square foot. He then applied a "decline factor" of approximately 4% per month to adjust those per-square-foot values. Graddy estimated the monthly rate of decline based on an analysis of residential sales during the first six months of 2008. He calculated a value for the Residence based on its size and the adjusted price per square foot he derived from the comps. Two of the comps used by Graddy were bank-owned properties. Presumably, the bank-owned properties were vacant at the time of sale. The other three comps were "private sales," meaning that they were sold by the private owners. Presumably, the private-sale properties were occupied at the time of sale. In Graddy's opinion, the FMV of the Residence had declined to

5

$115,000 at the commencement of the case.

In contrast, Ricks looked at four comps, one of which was also used by Graddy. All of the comps used by Ricks were private sales. Ricks worked directly from the sales price of each comp and did not convert the comps to a per-square-foot price. Ricks estimated a 2.3% monthly decline factor based on a comparison of sale prices over a 12-month period from June and July 2007 to June and July 2008. Based thereon, Ricks concluded that the Residence was worth approximately $145,000. Because Graddy relied upon bank-owned comps in his analysis, the court is persuaded that the methodology used by Ricks was more reliable in light of the applicable law.

The Debtor is currently living in the Residence and intends to stay there. She has the option in chapter 13 to surrender the Residence; however, her chapter 13 plan is structured to cure the default to Karpe and reinstate that obligation. The "purpose of the valuation" and the "proposed disposition or use" of the Residence is to determine its value as an owner-occupied property. (§ 506(a)(1).)

Generally, an owner-occupant will try to realize the highest and best price for her property in an open market. Conversely, a bank-owned property is marketed to liquidate the bank's inventory of foreclosed properties and minimize the bank's losses in a time of economic stress. Based on Graddy's testimony that bank-owned properties comprise 30 to 50% of the residential real estate market, this court can infer that banks have been under extreme pressure to liquidate their inventories of foreclosed properties. The court cannot assume that the bank is a "willing seller under no compulsion to sell." *In re Taffi*, *supra*, 96 F.3d at 1192. A bank simply does not have the same incentive to market a foreclosed property as patiently as an owner-occupant, or to necessarily realize the highest and best price. The inclusion of bank-owned properties in Graddy's appraisal will necessarily tend to generate lower values for the comps upon which the appraisal is based.

The Debtor argues that the bank-owned properties are part of the overall market and must be considered proportionately in any formula for valuing the Residence. However, that argument assumes that bank-owned properties are marketed the same and

6

tend to attract the same buyers as owner-occupied properties. A residential property acquired through foreclosure will presumably be vacant during the time it is on the market. A vacant property will presumably have a higher "deferred maintenance" factor. The appraiser can attempt to adjust for the condition of a particular property by estimating the "cost of repairs."[8] However, the court is not persuaded that all buyers are similarly motivated, that is, that all home buyers are necessarily willing to assume the burden and responsibility for making remedial repairs to a distressed property. This would suggest that unusual deferred maintenance, coupled with the bank's need to liquidate its inventory of properties, will drive the price of a bank-owned property down by some amount which exceeds the bare "cost of repair."

The court's analysis here is corroborated by the data in Graddy's own appraisal. Graddy used five comps, all roughly equivalent in size and configuration. Three of those comps (nos. 1, 2 & 4) were private sales made between January 28, 2008 and April 3, 2008. The selling price of those private-sale properties was $158,500, $140,000, and $140,000, respectively. The other two comps (nos. 3 & 5) were bank-owned sales on January 28, 2008, and May 23, 2008. The selling price of those bank-owned properties was $135,000 and $122,500, respectively. On average, the two bank-owned properties sold during the same four-month period for 12% less than the private-sale properties.

The point is further illustrated by a comparison of the comps on a price-per-square-foot basis. The price per square foot for the three private-sale properties was reported by Graddy to be $152.40, $122.48, and $129.63, respectively. The price per square foot for the two bank-owned properties was $117.49 and $111.97. Again, the lowest two values came from the bank-owned properties. The average price per square foot for the bank-

---

[8]Graddy reported that the Residence was in "average/fair" condition based on his inspection of the Residence. He reported that the two bank-owned properties were in "average" condition at the time of sale. He estimated that the Residence would require $5,000 of remediation to elevate its condition to "average." However, the appraisal does not show that Graddy actually inspected either of the bank-owned properties at the time they were sold.

7

1    owned properties was almost 15% less than for the private-sale properties.

2        This result is consistent with a comparison of the two comps which sold on the

3    same date; comps nos. 3 & 4 both have a "contract date" of January 28, 2008.  Comp 3

4    (bank-owned) sold for $117.49 per square foot, while comp 4 (private sale) sold for

5    $129.63 per square foot.  On the same date, the bank-owned property sold for almost 10%

6    less per square foot than the private-sale property even though the bank-owned property

7    was on a significantly larger lot (7,500 square feet versus 5,000 square feet).  Logically,

8    all other factors being the same, a larger lot size should be reflected in a higher price per

9    square foot for the house.

10        Graddy's appraisal includes "Days on Market" information for two of the comps,

11    nos. 4 & 5.  Comp 4, the private-sale property was on the market for 253 days.  By

12    comparison, the bank-owned property, comp 5, was only on the market for 31 days.  This

13    data further suggests that the bank-owned properties were marketed for the "quick sale"

14    as opposed to highest price.

15        Finally, the court notes that in calculating the "gross adjusted" price for each

16    private-sale comp, Graddy deducted the "closing costs."  The average "closing cost"

17    deduction from each private-sale comp was $6,200.[9]  When the debtor plans to retain the

18    real property, selling costs should not be deducted from the FMV when valuing a

19    creditor's interest in the property.  *In re Taffi, supra*, 96 F.3d at 1192.  (Hypothetical

20    selling costs are not considered when no sale is intended.); *See also United States*

21    *Farmers Home Administration v. Case (In re Case)*, 115 B.R. 666, 670 (9th Cir. BAP

22    1990) (closing costs should not be deducted when valuing real property under § 506(a)

23    for purposes of chapter 12 plan confirmation).[10]

24    _____

25       [9]A closing cost of $6,500 was deducted from comp 1; closing cost of $7,100 was

26    deducted from comp 2; and a closing cost of $5,000 was deducted from comp 4.  Graddy's
      appraisal does not report any closing costs for the two bank-owned comps.

27       [10]Ricks' appraisal also deducted closing costs from three of the comps averaging $4,067.

28    However, that deduction is irrelevant to the court's analysis because Ricks' appraisal supports a

**CONCLUSION.**

The court is not being asked to determine the precise fair market value of the Residence, but rather to find that its value was less than the amount owed to Karpe and secured by the first deed of trust. Based on the foregoing, the court is persuaded that Graddy's appraisal significantly understates the FMV for the owner-occupied Residence. Graddy's appraisal is based on a methodology which does not comply with applicable law, and upon certain assumptions about the value of bank-owned properties which make it inherently unreliable for the issue which the court is asked to decide. Graddy opined that the Residence had a FMV of $115,000. If Graddy's average closing cost of $6,200 is added back to that valuation, then the value increases to approximately $121,200. Using an estimated 10% multiplier to compensate for the inclusion of bank-owned comps, Graddy's valuation of the Residence increases to approximately $133,320, an amount that exceeds the debt to Karpe. Based on Bankers' appraisal of $145,000 (even after the deduction of closing costs), the court is persuaded that the fair market value of the Residence at the commencement of this bankruptcy case was greater than the amount of the first priority secured debt. Accordingly, Bankers' secured claim is not wholly unsecured and is entitled to the protection of § 1322(b)(2). The motion will be denied.

Dated: October ___/7___, 2008

W. Richard Lee
United States Bankruptcy Judge

---

ruling in favor of Bankers even after the closing cost deductions.